445 So.2d 578 (1984)
CITY OF TAMPA, Appellant,
v.
THATCHER GLASS CORPORATION, Appellee.
No. 64415.
Supreme Court of Florida.
February 9, 1984.
Joseph G. Spicola, Jr., City Atty., and Salvatore Territo, Asst. City Atty., Tampa, for appellant.
John W. McWhirter, Jr., of Lawson, McWhirter, Grandoff & Reeves, Tampa, for appellee.
Hugh C. Macfarlane and Ansley Watson, of Macfarlane, Ferguson, Allison & Kelly, Tampa, for Peoples Gas System, Inc., amicus curiae.
Stanford R. Solomon of Rudnick & Wolfe, Tampa, for Dart Industries, Inc., amicus curiae.
Thomas J. Tighe of Lunny, Tucker & Karns, Fort Lauderdale, for the City of Plantation, amicus curiae.
Paul A. Saad and John J. Cunningham, Jr., of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, for Anheuser-Busch Incorporated, amicus curiae.
William S. Bilenky, General Counsel, Tallahassee, for the Florida Public Service Commission, amicus curiae.
EHRLICH, Justice.
This is an appeal from a circuit court order, certified to this court by the district court as being a question of great public importance pursuant to article V, section 3(b)(5) of the Florida Constitution.
*579 Section 166.231 of Florida Statutes (1981) allows municipalities to levy a tax, up to ten percent, on the purchase of utility services within the municipality. The 1974 legislature added subsection 166.231(1)(b)[1] which exempts "fuel adjustment charges" from the tax.
Several natural gas utilities, acting as collection agents for municipalities, applied the exemption to "purchased gas adjustments," which are price adjustments to reflect fluctuations in the cost of the gas to the utility. In July 1982 Thatcher questioned the fact that it was not getting the exemption on the taxes it paid to Tampa, collected by Peoples Gas. Peoples filed an interpleader complaint against Thatcher and Tampa. Peoples was eventually discharged from liability in the interpleader action. Thatcher's cross claim against the city requesting a declaratory judgment construing section 166.231(1)(b) resulted in a declaratory judgment, wherein the trial judge construed section 166.231's "fuel adjustment charge" exemption to include natural gas, thus barring Tampa from taxing the adjustments. This appeal followed. We affirm the trial court.
"Fuel adjustment charge" has a technical meaning in the utilities industry, denoting an adjustment to an electric bill reflecting shifting prices of fossil fuels used to generate the electricity sold by electric utilities. The purpose of the charge is to allow utilities to pass on to customers the changing cost of providing service attributable to market forces beyond the control of the utility, without requiring the utility to seek a rate adjustment from the Florida Public Service Commission each time. See generally, Foy, Cost Adjustment in Utility Rate Schedules, 13 Vand.L.Rev. 663 (1960). In the utilities industry, "purchased gas adjustment" refers to similar adjustments to natural gas bills, reflecting changes in the price the utility pays for the gas it sells. The City of Tampa urges this Court to accept the technical denotation of "fuel adjustment charge," thus limiting the tax exemption to electric bills. Thatcher urges us to read the phrase using the common meaning of the words, to include both electric and natural gas adjustment charges.
The cardinal rule of statutory construction is "that a statute should be construed so as to ascertain and give effect to the intention of the Legislature as expressed in the statute." Deltona Corp. v. Florida Public Service Commission, 220 So.2d 905, 907 (Fla. 1969). When a word has both a common and a technical meaning, "the court will give it effect according to the popular signification, if it was so used by the Legislature, and the context may be referred to in ascertaining the sense in which it was used." Southern Bell Telephone & Telegraph Co. v. D'Alemberte, 39 Fla. 25, 39, 21 So. 570, 572 (1897).[2]
*580 In determining whether the common or the technical meaning of the phrase at issue here should be used, we look to the context in which it is used. In this case the legislature has provided us with an explicit definition: "`fuel adjustment charge' shall mean all increases in the cost of utility services to the ultimate consumer resulting from an increase in the cost of fuel to the utility subsequent to October 1, 1973." § 166.231(1)(b). We find the common meaning of "fuel" supplied by the trial judge to be adequate: "Any matter used to produce heat or power by burning, as wood, coal, peat, petroleum, gas... ." Webster's New International Dictionary, Second Edition 1016 (1947). The definition of "fuel adjustment charge" provided by the legislature thus expands the meaning of the technical term to the common meaning of the phrase, which is within the permissible meaning of the words.
Tampa argues that "cost of fuel to the utility" implies that "fuel" means fuel used by the utility rather than resold as a commodity. The city urges that subsection 166.231(1)(b), when read in pari materia with the rest of the section, supports its position. The city draws our attention to subsection 166.231(4):
The purchase of natural gas or fuel oil by a public or private utility either for resale or for use as a fuel in the generation of electricity, shall be exempt from taxation hereunder.
However, we find no disharmony between this subsection and subsection (1)(b) as we interpret it. Both natural gas and fuel oil are "fuels," and subsection (4) merely provides that such fuels are exempt from taxation when purchased by a utility as a commodity or to fuel electric generators. Subsection (4) also demonstrates that the legislature was aware of the distinction between fuel used as a commodity and fuel used to fire electric generators. The legislature could have made the same distinction in subsection (1)(b), but did not, buttressing the general application of (1)(b) we find here.
Because we have determined that the legislature specified the common meaning in its definition of the term, there is no ambiguity and we do not need to address the other indicia of legislative intent urged by Tampa. The trial judge properly based his decision on interpreting the definition provided by the legislature, and his examination of other indicia of legislative intent is dictum and does not require review.
This decision shall apply prospectively, except for those taxpayers who have timely judicially challenged the exemption. The fact that Florida municipalities were about equally divided regarding application of the exemption, and that there has been no prior judicial interpretation on this issue demonstrates that the City of Tampa was acting in good faith. Where a tax is imposed in good faith reliance on a statute, "the taxpayers, other than those who challenged the statute, ... are not entitled to a refund." Osterndorf v. Turner, 426 So.2d 539, 545 (Fla. 1982).
Accordingly, we affirm the trial court decision and declare its effect to be prospective with the exception outlined above.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD and SHAW, JJ., concur.
NOTES
[1] Ch. 74-109, Laws of Fla. (codified as amended at § 166.231(1), Fla. Stat. (1981)). The relevant language of section 166.231 reads:

166.231 Municipalities; public service tax. 
(1)(a) A municipality may levy a tax on the purchase of electricity, metered or bottled gas (natural liquified petroleum gas or manufactured), water service, telephone service, and telegraph service. The tax shall be levied only upon purchases within the municipality and shall not exceed 10 percent of the payments received by the seller of the taxable item from the purchaser for the purchase of such service. Municipalities imposing a tax on the purchase of cable television service as of May 4, 1977, may continue to levy such tax to the extent necessary to meet all obligations to or for the benefit of holders of bonds or certificates, which were issued prior to May 4, 1977.
(b) The tax imposed by paragraph (a) shall not be applied against any fuel adjustment charge, and such charge shall be separately stated on each bill. "Fuel adjustment charge" shall mean all increases in the cost of utility services to the ultimate consumer resulting from an increase in the cost of fuel to the utility subsequent to October 1, 1973.
[The quoted language is substantially the same as that enacted by the 1974 legislature, with the exception of the special provision for cable television.]
[2] Technical words are those "[b]elonging or peculiar to an art or profession." Black's Law Dictionary 1312 (rev. 5th ed. 1979). The presumption favoring the "popular signification" of technical terms applies unless the profession to which the technical term belongs is the legal profession. Terms of special legal significance are presumed to have been used by the legislature according to their legal meanings. Davis v. Strople, 39 So.2d 468 (Fla. 1949). (Barnes, J, concurring in part and dissenting in part). Compare Ocasio v. Bureau of Crimes Compensation, 408 So.2d 751 (Fla. 3d DCA 1982) ("affinity" found to have acquired specific legal meaning; statute therefore should be read using the legal meaning of the term) with State v. Brown, 412 So.2d 426 (Fla. 4th DCA 1982) ("nonconsumable" found not to have technical legal meaning; statute therefore interpreted based on common meaning of the term). In this case, "fuel adjustment charge" has technical significance in the utilities industry, but has not been subjected to the rigors of the playing fields of the law which would render it of specific legal significance. See generally, 30 Fla.Jur. Statutes § 98 (1974). The presumption in this case therefore favors the common meaning of the term. Southern Bell is especially instructive, for there the Court rejected the technical definition of a term as used by a utility, in favor of the common, dictionary definition.