# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D2023-3308
_____

GLOBAL HOOKAH DISTRIBUTORS,
INC.,

    Appellant,

    v.

DEPARTMENT OF BUSINESS AND
PROFESSIONAL REGULATION,
DIVISION OF ALCOHOLIC
BEVERAGES AND TOBACCO,

    Appellee.

_____

On appeal from the Division of Alcoholic Beverages and Tobacco.
Patrick Cunningham, Director.

February 26, 2025

TANENBAUM, J.

The Florida Legislature imposes excise taxes and surcharges on defined tobacco products other than cigarettes (commonly referred to as "Other Tobacco Products," or "OTP")—taxes and surcharges paid by the distributors of those products. *See* §§ 210.276, 210.30, Fla. Stat. By statutory definition, tobacco products subject to this taxation include "loose tobacco suitable for smoking." § 210.25(12), Fla. Stat. Global Hookah Distributors, Inc. ("Global"), distributes the tobacco products made for use in a waterpipe, commonly called a hookah—an apparatus by which tobacco is heated (typically) through combustion of something else,

producing ultimately a cloud containing, among other things, vaporized nicotine. The distributor paid the taxes and surcharges and then sought a refund, arguing its products did not fit within the definition of taxable tobacco.

We must consider the five above-quoted words—"loose tobacco suitable for smoking"—within the context of the surrounding statutory text and determine whether Global is correct. *See id.* As a means to yield vaporized nicotine for inhaling, there is no meaningful difference between combusting cut-up tobacco leaves, on the one hand; and subjecting those cut-up leaves to high heat by burning something else. Either way, the product—when used as designed—delivers vaporized nicotine to the bloodstream, most often via the lungs, and almost always along with combustion byproducts. More importantly, the ordinary person would understand both approaches to be "smoking," and publications over time consistently have referred to hookah usage as smoking. We conclude Global's tobacco products are subject to taxation, and we affirm the administrative order denying the requested refund, which reaches the same conclusion.

I

A

Even though the statute we consider here deals with tobacco, we would be remiss if we did not first mention what makes tobacco seemingly so desirable and subject to extensive regulation and taxation. Across history and world cultures, the human relationship with tobacco has been driven by the desire for nicotine. Nicotine is an oily liquid alkaloid[1] found in the tobacco plant, particularly its leaves. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, *Nicotine: Systemic Agent*, available online at https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750 028.html; J.W. Gorrod & M.-C. Tsai, *Nicotine and the Tobacco Alkaloids, in* MOLECULES OF DEATH 233, 237 (R.H. Waring et al.

---

[1] An alkaloid is a naturally occurring, nitrogen-containing basic compound that can have a significant physiological effect in humans. Caffeine is another example.

eds., 2d ed. 2007). It can be an addictive substance. Upon entering the bloodstream and reaching the brain, it can have psychoactive effects, including the experience of a mild euphoria. The lungs are one common way by which nicotine is taken into the body; the mouth is another.

Nicotine being a liquid, it easily can enter the bloodstream through direct contact with the mouth's membranes. To enter the blood through the lungs, on the other hand, it first must be aerosolized or vaporized so that it can be drawn into the lungs by inhalation.[2] In other words, vaporization, by whatever means, is but one quick and efficient means to introduce nicotine into the bloodstream and get it to the brain.

Because nicotine is endemic within the tobacco leaves, aerosolization—the suspension of liquid particles in a gas—would first require mechanically isolating the substance from the leaf. Vaporization—the conversion of matter to the gaseous phase—simply requires heating the nicotine to its boiling point: roughly 475 degrees Fahrenheit. *Nicotine*, NAT'L CTR. FOR BIOTECHNOLOGY INFO.: PUBCHEM, https://pubchem.ncbi.nlm.nih.gov/compound/Nicotine (last visited Feb. 18, 2025); Ronald W. Ryall, *Nicotine, in* 1 POISONS OF PLANT ORIGIN 61, 61 (L.L. Simpson and D.R. Curtis, eds., 1974) (identifying the boiling point of nicotine as 246 to 247 degrees Celsius); Gorrod & Tsai, *Nicotine and the Tobacco Alkaloids, in* MOLECULES OF DEATH 233, 237 (same); Luigi Sansone et al., *Nicotine: From Discovery to Biological Effects*, 24 INT. J. MOL. SCI. 2, 6 (2023) (same). Combustion of tobacco certainly produces enough heat to do this, the temperature of burning leaves ranging from 750 degrees to over 1,400 degrees Fahrenheit. *See* Reto Auer et al., *Heat-Not-Burn Tobacco Cigarettes: Smoke by Any Other Name*, 177 JAMA INTERNAL MED. 1050, 1050 (2017) (noting "[c]omplete combustion occurs at a high temperature (>1300°C), higher than the heat generated by smoking a tobacco cigarette (<800°C)"); *see also* Nadja Mallock et al., *Heated Tobacco Products: A Review of Current Knowledge and Initial Assessments*, 7 FRONTIERS IN PUB. HEALTH 1, 2 (2019)

---

[2] In cigar smoking (not at issue here), nicotine is absorbed in gaseous form through the mouth's lining.

(discussing varying temperatures of tobacco combustion). When someone smokes a cigarette, he effectively burns the cut-up tobacco leaves inside to vaporize the nicotine they contain so he can inhale the alkaloid and experience a euphoric "hit." This, though, is but one way to vaporize the nicotine.

For hundreds of years, apparently starting in India and spreading later to Persia and later throughout the Ottoman Empire, a waterpipe known as a hookah was used to facilitate vaporizing the nicotine without combusting the tobacco. Cecily S. Ray, *The hookah – the Indian waterpipe*, 96 CURRENT SCIENCE 1319, 1319 (May 25, 2009) (noting the "hookah, water pipe, originated in India and became popular for smoking tobacco," spreading across the Middle East and northern Africa); Srinivas S. Ramachandra & Ali Yaldrum, *Shisha Smoking: An emerging trend in Southeast Asian nations*, 36 J. PUB. HEALTH POL'Y 304, 308 (2015) ("Shisha smoking originated in India and the Arab world . . . ."). Instead, burning charcoal was used to heat the tobacco—indirectly and not to the point of combustion, but to the point of smoldering, where it would emit the nicotine as a vaporous cloud that could then be inhaled. By this method, the tobacco does not necessarily burn, but the charcoal does, the smoke from the charcoal being drawn across the heated tobacco and combining with the nicotine vapor to be inhaled together by the user.

No matter what method or activity is used, it is clear historically that tobacco is not consumed or used for its own sake; it is used, and has been for centuries, for the nicotine it contains. This fundamental fact drives our analysis of the statutory text at issue.

B

Global is a North Carolina-based distributor of hookah and its supplies and accessories, having been in operation for over twenty years. Since 2003, Global has remitted to the Division of Alcoholic Beverages and Tobacco ("ABT") the OTP tax on its products sold in Florida. On May 15, 2019, Global submitted to ABT an application for refund, alleging it overpaid $1,412,705.16 in excise taxes and surcharges on its products sold in Florida from April 2016 to January 2019 because its products failed to meet the definition of "tobacco products" under Florida law. On May 9, 2022,

4

ABT denied Global's request, finding Global's products to meet the definition of a "tobacco product" and thus subject to the OTP excise taxes and surcharges. Global then petitioned ABT for an administrative hearing under Chapter 120, Florida Statutes, contesting ABT's notice of final refund denial. The dispute was referred to the Division of Administrative Hearings ("DOAH") for a formal administrative hearing. *See* § 120.57(1), Fla. Stat.

The evidence showed that hookah tobacco is shredded and chopped from cultivated tobacco leaves and used in its loose form in a hookah pipe. The cut tobacco is blended with glycerol or propylene glycol, sugar syrup (including molasses), and flavorings or solvents to create the rather "sticky" and "gluey" finished products Global distributes. Notably, the pieces of the cut tobacco are discernable within the product as packaged.

The finished product is then enjoyed using a specialized device comprised of these components: a base filled with water, a hose with a valve, an ashtray, a shisha bowl, aluminum foil, and coals (or other heating form). The consumer chooses the sized helping of prepared tobacco (shisha) to use at a time; at which point it is fluffed and sprinkled within the bowl, covered with a layer of aluminum foil, then heated indirectly by placing the coals or an alternative heating form atop the foil. The glycerol or propylene glycol portion of the product vaporizes; so does the nicotine. Once formed, the vapor travels through the holes located in the bottom of the shisha bowl to the hose, and finally to the water chamber, which has the effect of cooling the vapor cloud before its inhalation by the consumer.

Notably, the heated coals or alternative heating form do not touch the shisha placed within the bowl, and the tobacco product itself does not combust. Global contends this is a marked difference supporting the conclusion it does not count as "smoking" because it involves the vaporization of glycerol and nicotine, rather than the burning or combustion of the tobacco. According to Global, smoke has both a particulate-suspension phase and a vapor stage, which varies in composition by product. That is not to say that, even under this definition, there is no smoke involved; after all, the burning charcoal—itself an organic substance, oftentimes vegetative in origin—no doubt puts off similar particulates (not to

5

mention, carbon monoxide) that burning the leaf does—this "smoke" carrying with it the vaporized nicotine as it travels across the super-heated tobacco product in the shisha bowl. But, by Global's logic, this is not "smoking" because the tobacco itself does not produce the particulate suspension that Global contends is required for the resulting cloud to be called smoke. In either case, though, nicotine contained within the tobacco leaves is released in a vaporized form upon exposure to high heat, that vaporized form being inhaled by the user together with suspended particulate in a visible cloud. As Global's expert acknowledged, the "end game" of the hookah experience, as with other uses of tobacco, is the "shot of nicotine."

After the hearing, the administrative law judge ("ALJ") concluded that Global's hookah product fits within the meaning of "loose tobacco suitable for smoking" and, accordingly, found Global was not entitled to a refund of the OTP excise taxes and surcharges. The ALJ found the product, as sold and consumed, to be loose because it is "used in its loose form in a hookah pipe," "easily identifiable as cut pipe tobacco," "fluffed to a loose consistency for use," and "retains its fundamental character as loose pipe tobacco." The ALJ also found Global's product to be "suitable for smoking," because it is understood to be "smoked" within the understanding of the "common vernacular." The ALJ thus concluded Global's hookah product fits within the meaning of "loose tobacco suitable for smoking" as the phrase is "commonly understood." ABT adopted the ALJ's recommended order as final on November 29, 2023. Global now appeals, contending primarily that its hookah product is neither "loose" nor "suitable for smoking," rendering section 210.25(12), Florida Statutes, inapplicable to its product and entitling it to a refund of the OTP taxes and surcharges paid.

## II

## A

Sections 210.276 and 210.30, Florida Statutes, set forth the OTP tax and surcharge at issue here. One imposes "[a] surcharge . . . levied upon all tobacco products in this state and upon any person engaged in business as a distributor of tobacco products." § 210.276(1), Fla. Stat. The other imposes a tax "upon all tobacco

6

products in this state and upon any person engaged in business as a distributor thereof." § 210.30(1), Fla. Stat. ABT administers this taxation. *See* § 210.75, Fla. Stat.

"Tobacco products," subject to the surcharge and tax, is a defined term, meaning

> *loose tobacco suitable for smoking*; snuff; snuff flour; cavendish; plug and twist tobacco; fine cuts and other chewing tobaccos; shorts; refuse scraps; clippings, cuttings, and sweepings of tobacco, and other kinds and forms of tobacco prepared in such manner as to be suitable for chewing; but "tobacco products" does not include cigarettes, as defined by s. 210.01(1), or cigars.

§ 210.25(12), Fla. Stat. (emphasis supplied). The meaning of the highlighted noun phrase is what we must address to resolve this appeal.

At first blush, the text leaves little doubt as to its meaning. Indeed, this court has noted—and the parties agree—the phrase is "clear and unambiguous." *Brandy's Prods., Inc. v. Dep't of Bus. & Pro. Reg.*, 188 So. 3d 130, 132 (Fla. 1st DCA 2016). In announcing its "law of statutory interpretation," though, the supreme court warned against "interpreters" mistakenly thinking they are required "to make a threshold determination of whether a term has a 'plain' or 'clear' meaning in isolation, without considering the statutory context and without the aid of whatever canons might shed light on the interpretive issues in dispute." *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022).[3] "When called on to resolve a dispute over a statute's meaning," we must "exhaust all the

---

[3] The dissent playfully intimates our approach resembles that of Justice Kagan, whose quip about "textualism" effectively eviscerated the original meaning behind that term. Under other circumstances, the dissent's attempt at critique would be considered "fighting words." Here, though, we find good company with the chief justice's majority opinion in *Conage v. United States*, in which the court—call it what you want—announced the prevailing "law of statutory interpretation" to which we now faithfully and closely hew.

textual and structural clues bearing on that meaning." *Alachua Cnty. v. Watson*, 333 So. 3d 162, 169 (Fla. 2022) (internal quotations and citations, and some brackets, omitted). "That is because the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Conage*, 346 So. 3d at 598 (internal quotation and citation omitted). "Viewed properly as rules of thumb or guides to interpretation, rather than as inflexible rules, the traditional canons of statutory interpretation can aid the interpretive process from beginning to end." *Id.*

"When called on to resolve a dispute over a statute's meaning, we normally seek to afford the law's terms their ordinary meaning at the time the legislature adopted them." *Watson*, 333 So. 3d at 169; *see also Conage*, 346 So. 3d at 598 ("When a contested term is undefined in statute or by our cases, we presume that the term bears its ordinary meaning at the time of enactment, taking into consideration the context in which the word appears."). The text we consider here has gone unchanged since its enactment in 1985. *See* ch. 85-141, § 1, at 1022–22, Laws of Fla. Dictionaries "typically" provide "the best evidence of that ordinary meaning," so that is where we will turn. *Conage*, 346 So. 3d at 598; *cf. Lake Cnty. v. Rollins*, 130 U.S. 662, 670 (1889) ("To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them."); 1 WILLIAM BLACKSTONE, COMMENTARIES *59 ("Words are generally to be understood in their usual and most known signification; not so much regarding the propriety of grammar, as their general and popular use.").

Ultimately, we derive that meaning by "ask[ing] how a reasonable person, conversant with the relevant social and linguistic conventions, would read the text in context." John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2393 (2003); *see also Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 947 (Fla. 2020) (recognizing that "the goal of interpretation is to arrive at a fair reading of the text by determining the application of [the] text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text

at the time it was issued" (internal quotations and citation omitted)). With this foundation, we go to the contested text.

B

Let us first take the phrase "loose tobacco." As this court noted in *Brandy's Products,* a definition of "loose tobacco" is absent from the statute. 188 So. 3d at 131. In construing the terms in their plain and ordinary sense, the court relied on a collation of dictionary definitions, determining "loose" to mean "not rigidly fastened or securely attached," "not brought together in a bundle, container, or binding," "not dense, close, or compact in structure or arrangement," and "not solid." *Id.* at 132 (internal citation omitted); *accord* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 705 (1984). This court in a later decision observed "the prototypical 'loose tobacco' product" as being "filler tobacco," which, "like the other stuff in [the "tobacco product" definition, such as "snuff," "cuttings," and "clippings,"] . . . is shredded and chopped from cultivated tobacco leaves for smoking in a pipe, blunt wrap, or other suitable vessel." *Grabba-Leaf, LLC v. Dep't of Bus. & Prof'l Reg.*, 257 So. 3d 1205, 1210 (Fla. 1st DCA 2018); *see also id.* (noting also how filler tobacco "is structurally distinct from a whole leaf tobacco wrap, which is comparatively compact, *unbroken*, and solid, *such that it can bundle, contain, and secure loose filler tobacco*" (emphases supplied)). We struggle to reconcile this definition with Global's claim that its hookah product fails to "clearly meet this description" because, it says, its tobacco "is mixed and bound together to make a final product" and "remains attached to the other ingredients from purchase to consumption."

The binding agents serve, as pointed out by Global's expert, to "hold" the tobacco together with the other products, "so they do not fall through holes in the bottom of the shisha bowl." In other words, the tobacco must be contained within a "sticky" and "gluey" product to keep the otherwise loose tobacco from falling apart. This would not be necessary, of course, if the tobacco were not shredded and in pieces, rather than in an "unbroken" form that could "bundle, contain, and secure loose filler tobacco." Indeed, the binding agents "hold the *pieces* of tobacco together enough that when the tobacco is heated and puffed the *pieces* of tobacco . . . do not get sucked into the hookah pipe." (emphases supplied).

9

Moreover, the product placed by the consumer within the bowl is not of a predetermined amount. Rather, a consumer engages in a more personalized experience by selecting how much or how little of the product he or she wishes to use, the tobacco leaves and veins apparent in the finished product. As indicated by Global's expert, what remains of the experience "are pieces of the hookah tobacco" that "turn black or dark brown" and are "left in the bowl." He observed they "are still individual pieces of tobacco" such that you "can go through" and "pick them out."

We find this evidence sufficient—as did the ALJ—to show Global's hookah product fits well within the meaning of "loose tobacco."

C

Next, we consider the phrase "suitable for smoking." Agreeing the phrase is "plain and unambiguous," the parties nevertheless offer competing interpretations as to its meaning—each relying upon a dictionary definition in support of their proposition. Global takes the position that the term "smoking" requires "burning" or "combustion" of the hookah tobacco, which does not technically occur; in ABT's view, the phrase has a broader meaning, one focusing more on the fumes or vapors that result from the hookah's heating process, which does occur. This is not a technical phrase, and the statute does not pertain to a technical subject. *See City of Tampa v. Thatcher Glass Corp.*, 445 So. 2d 578, 580 (Fla. 1984) ("In determining whether the common or the technical meaning of the phrase at issue here should be used, we look to the context in which it is used."). We look, then, for its ordinary, commonly understood meaning, grounded in the common understanding of those it aims to legislate—the typical businessperson involved in the sale and distribution of tobacco products. *See Guar. Tr. & Safe-Deposit Co. v. Buddington*, 9 So. 246, 249 (Fla. 1891) ("Now, in the use of language not technical, the legislature must be supposed to express their meaning according to the sense in which it will be understood by the persons for whom they legislate."); *S. Bell Tel. & Tel. Co. v. D'Alemberte*, 21 So. 570, 572 (Fla. 1897) ("While it is true, as a general rule, that popular words are to be construed in the popular sense, and technical words in a technical sense, when used in a statute, yet, when a word has both a popular and a

technical meaning, the court will give it effect according to the popular signification, if it was so used by the legislature, and the context may be referred to in ascertaining the sense in which it was used.").

There are definitions for "smoking" in contemporaneous dictionaries to accommodate both sides' positions. "Smoking" is the gerund form of the verb "smoke." As a verb, "smoke" can carry a more specific definition: "to inhale and exhale the fumes of burning plant material and esp. tobacco." WEBSTER'S NINTH at 1113; *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1221 (William Morris ed., New College ed. 1979) (defining "smoke" as follows: "To draw in and exhale the smoke (of tobacco or the like)," and "To draw in and exhale smoke from a cigarette, cigar, pipe, or the like."). It also carries a definition that is more general in nature: "to inhale and exhale the smoke of." WEBSTER'S NINTH at 1113; *see also* AMERICAN HERITAGE at 1221.

To consider this more general definition, we must turn to the noun form of "smoke." There we see a similar specific-general variation. More specifically, dictionaries define "smoke" to mean "the gaseous products of burning carbonaceous materials made visible by the presence of small particles of carbon." WEBSTER'S NINTH at 1113; *see also* AMERICAN HERITAGE at 1221 (defining the term to mean "[t]he vaporous system made up of small particles of carbonaceous matter in the air, resulting mainly from the incomplete combustion of organic material, such as wood or coal"). More generally, smoke means "fume or vapor often resulting from the action of heat on moisture." WEBSTER'S NINTH at 1113; *see also* AMERICAN HERITAGE at 1221 (referring to "[a] suspension of particles in a gaseous medium"). This variation in definitions does not necessarily mean we have an ambiguity—although that no longer may even be a meaningful threshold question—for even though "[m]any words have more than one ordinary meaning . . . context disambiguates." ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012); *see Conage*, 346 So. 3d at 598 (noting how "the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole").

To determine which of these ordinary meanings gives us a fair reading of the statute as a whole, we consider the phrase in the context of the words surrounding it. *Cf. Conage*, 346 So. 3d at 600 (considering word "together with the company it keeps" in the statute and applying, "[a]s a practical matter," the "understanding of" the word that best "preserve[s] the statute's internal consistency"). We first look at how the term "smoking" fits in grammatically with what surrounds it. *See* Scalia & Garner, READING LAW at 140 ("Words are to be given the meaning that proper grammar and usage would assign them."). In the statutory provision, "smoking" is a gerund—the noun form of a verb—and it is the object of the proposition "for," which operates to modify something else in terms of its purpose or fitness, as expressed by the object that follows the preposition. Here, the preposition links "smoking" to "suitable," defined to mean (in a way most fitting to this context) "adapted to a use or purpose." WEBSTER'S NINTH at 1180. "Smoking," grammatically speaking, modifies "suitable" by answering this question: to what "use or purpose" has something been "adapted"? "Suitable," itself an adjective—now modified by "smoking"—in turn modifies the nominative phrase that precedes it: "loose tobacco." If we put this all together, we see that the phrase references loose tobacco that has been prepared to be used in some activity called "smoking."

Now return to consideration of the specific and general definitions of smoking mentioned above. The specific—expressed in terms of burning the tobacco itself—references a particular means of producing heat and the byproducts typically inhaled along with the nicotine vapor. Going with this more specific meaning focuses on doing something to the tobacco rather than on why it is being used in this way, thereby ignoring a purpose of tobacco taxation, abundantly clear from its text—regulation of the addictive behavior relating to nicotine. *Cf.* § 210.276(1), Fla. Stat. (imposing surcharge at rate of 60 percent of wholesale price); § 210.30(1), Fla. Stat. (imposing tax at rate of 25 percent of price); Lucy Dadayan, *States' Addition to Sins: Sin Tax Fallacy*, 72 NAT'L TAX J. 723 (2019) (discussing history of sin taxes, including taxation of tobacco); Atul Sarma, *Regulating Tobacco Use: Role of Taxes*, 35 ECON. AND POL. WKLY. 4613 (2000) (addressing tobacco taxation as tobacco control policy); *see* Scalia & Garner, READING

LAW at 36–38 (describing textualist exercise in gleaning purpose from statute's text).

We can see this purpose also in the latter portion of the same definition, which identifies twelve additional tobacco products subject to the OTP tax. § 210.25(12), Fla. Stat. (defining "tobacco products" to mean "loose tobacco suitable for smoking; snuff; snuff flour; cavendish; plug and twist tobacco; fine cuts and other chewing tobaccos; shorts; refuse scraps; clippings, cuttings, and sweepings of tobacco, and other kinds and forms of tobacco prepared in such manner as to be *suitable for chewing. . .*" (emphasis supplied)); *see also Conage*, 346 So. 3d at 600. Once again, the Legislature categorizes tobacco for taxation based on how it will be used by the consumer to extract nicotine. By listing forms "suitable for chewing," the statute captures similar consumer experiences involving the absorption of nicotine—by contact with the mouth's lining—within its reach. What might happen to the tobacco during this extraction is not relevant; what matters is whether the tobacco has been prepared so it is usable in the mouth to put the leaves' nicotine into the bloodstream. If so, it is subject to the statutes' surcharge and tax.

Overall, then, the statutory definition for "tobacco products" gives us two categories of nicotine-absorption activity to be charged and taxed: smoking and chewing, the former accomplishing its objective through heat, smoke, and nicotine vaporization; the latter through direct contact with the mouth's linings and membranes. A fair reading of "smoking" in this context ties the statute to the use of heat as an activity to get the nicotine into a gaseous state and facilitate quick absorption into the bloodstream, regardless of the combustion means applied, the origin of the accompanying particulate, and what happens to the tobacco once it is used. A commonsense approach, then, calls for using the more general ordinary meaning—the one referring to an activity involving heat, smoke, and nicotine vaporization, regardless of what is being burned to get there.[4]

_____

[4] We do not address whether use of an electric or electronic heating element would produce a different outcome. But we suggest that how the loose tobacco actually is used in individual

13

This more general meaning better comports with what sections 210.276 and 210.30 do—subject loose tobacco to heavy charges and taxation (other than that type of tobacco already rolled into cigarettes and cigars) if it is prepared and sold for use as a nicotine delivery vehicle. In this respect, we see no relevance in whether a consumer burns shredded tobacco leaves directly to extract the nicotine for inhalation, along with the burnt tobacco byproducts; or instead heats the shredded leaves to nicotine's boiling point and inhales the vapor, along with byproducts of burning charcoal. If we assigned "smoking" the more specific ordinary meaning—limiting the term to refer only to burning of the tobacco—we would be doing so based on a technical distinction without any meaningful difference. Certainly, the wording of the statutes, taken together, do not point us in that direction. As has been discussed, quite the contrary is the case.

Suffice it to say, to close this line of analysis out, nowhere in the statutes addressing the taxation of OTP is there mention of using the tobacco in one particular way—say, by burning it. The only statutory modifiers applied to the loose tobacco speak in terms of its use in certain activities that, over the centuries, humans have used to get at that alkaloid called nicotine. The fair reading calls for the more general, ordinary meaning of "smoking." That one refers to the activity in which tobacco can be used to produce the nicotine—an activity involving burning (be it tobacco or something else) so that heat and a smoky cloud of particulate are produced—the latter of which being inhaled along with nicotine vapor, which in turn is a product (at all events) of the former.[5]

---

instances does not matter. The only question before us is what it means for the loose tobacco to be "suitable for smoking." If the loose tobacco is prepared and distributed so it *can be* used for smoking in the more general sense, as discussed, then it is subject to the charge and tax, even if it can also be heated in other ways—without any cloud of smoke—to vaporize the nicotine.

[5] We are aware of the "fundamental rule of construction that tax laws are to be construed strongly in favor of the taxpayer and against the government, and that all ambiguities or doubts are to be resolved in favor of the taxpayer." *Maas Bros., Inc. v. Dickinson*,

D

We close with one more observation. If we were to ask someone strolling past a hookah lounge to identify the action taking place within the lounge, we have no doubt he or she would describe the activity as "smoking," noting sensory cues that would indicate to a reasonable observer that consumers are inhaling and exhaling a white cloud of some sort, which also would be wafting in the surrounding air. Global's claim that the vapor from its product differs from "traditional" smoke feels like splitting hairs— the ordinary person, whether in 1985 or today, would not recognize the difference. To be sure, commonsense tells us the inhalation of any visible haze—vaporized glycerine or nicotine, burning tobacco or charcoal, or other comparable form—would be commonly recognized as "smoking." Without specialized knowledge, most people would not detect the subtle differences that would suggest otherwise. To adopt an interpretation informed chiefly by scientific concepts and conclude differently would thus flout the very "analysis" we are compelled to give: plain meaning.

Indeed, when asked whether hookah tobacco creates smoke, Global's president testified that "in general context people would refer to it as smoke." Even without knowledge of the particulate and vapor phases of smoke or nicotine, or of the "burning" or "combustion" of the hookah tobacco product or the charcoal—the surrounding context and perception supports the interpretation that the product is indeed "suitable for smoking" in the eyes of an ordinary person. So, the meaning of "smoking" in this context is obvious. *See* Richard A. Posner, *Legal Formalism, Legal Realism, and the Interpretation of Statutes and the Constitution*, 37 CASE W. RES. L. REV. 179, 187 (1986) ("A text is clear if all or most persons,

195 So. 2d 193, 198 (Fla. 1967). All we are doing here, though, is determining which ordinary meaning of otherwise plain text reflects the fairest reading of the statute in question, considering the text in the context of the whole statute. *Cf. Conage*, 346 So. 3d at 598–601 & n.3 (rejecting "overly narrow definition" while still engaging in "ordinary meaning" analysis). We are not faced with two equally fair readings, so no construing—one way or the other— is necessary.

having the linguistic and cultural competence assumed by the authors of the text, would agree on its meaning.").

This understanding also finds support in our search of journal articles and periodicals, all which consistently—and matter-of-factly—refer to "hookah smoking" as a species of tobacco smoking. *See, e.g.*, *FOOD IN NORTHERN INDIA.: Women Who Work the Mill — Cooking Without Stove or Range.*, THE FLA. STAR, Oct. 25, 1888, at 3 ("Some women smoke the hookah, and all of them chew pan a large portion of the time."); Sara Watson, *Hookah harms like cigarettes*, THE INDEP. FLA. ALLIGATOR, Nov. 14, 2006, at 5 (discussing health risks and growing popularity of "hookah smoking"); National Institute on Drug Abuse, *Tobacco, Nicotine, and E-Cigarettes Research Report: Other Tobacco Products*, (Jan. 1, 2020), available online at https://nida.nih.gov/publications/research-reports/tobacco-nicotine-e-cigarettes/other-tobacco-products (discussing health risks of "hookah smoking" and "hookah use for tobacco smoking"); Mary Rezk-Hanna et al., *Acute Effect of Hookah Smoking on Arterial Stiffness and Wave Reflections in Adults Aged 18 to 34 Years of Age*, 122 AM. J. CARDIOL. 905 (June 5, 2018) (discussing study into health effects of "hookah (waterpipe) smoking"); Centers for Disease Control and Prevention, *Smoking and Tobacco Use: Hookahs*, (Oct. 17, 2024), available online at https://www.cdc.gov/tobacco/other-tobacco-products/hookahs.html (defining "hookahs" as "water pipes that people use to smoke specially made tobacco" and addressing health effects of "smoking hookah"); Gatrad, Rashid, *One Last Puff*, 335 BRITISH MED. J. 20 (2007) (describing health effects of "hookah smoking," which is a process involving "smoke from the charcoal [being] pulled through the tobacco" and inhaled); Ray, *The hookah – the Indian waterpipe* at 1319 (discussing the history of using the "hookah for tobacco smoking").

The common understanding of "smoking" tobacco undoubtedly—to both the person on the street and to the scientist—includes use of combustion of something besides the tobacco to accomplish the same end with the tobacco: to heat it

enough to produce nicotine vapor that can be inhaled along with the particulate smoke produced by the combustion as a byproduct.[6]

\* \* \*

Having found no ground for setting aside, modifying, remanding, or ordering agency action or ancillary relief, the final administrative order finding as such, subjecting Global to the OTP tax and surcharge, must stand. *See* § 120.68(8), Fla. Stat.

AFFIRMED.

B.L. THOMAS, J., concurs; ROBERTS, J., dissents with an opinion.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

ROBERTS, J., dissenting.

In 2015, Justice Elena Kagan announced that "we're all textualists now."[1] In 2022, Justice Kagan receded from this claim, writing: "Some years ago, I remarked that '[w]e're all textualists

---

[6] In other words, any reasonable person who watches the use of a hookah waterpipe—with the burning charcoal, the smoke, and the inhaling, and with the tobacco at centerstage in all this—will call this activity "smoking." Indeed, what *else* is there to call it? Hookah-using? Waterpiping? It is not readily apparent to us how this practical, ordinary, person-on-the-street understanding, when the word "smoking" is considered in the context of the statute as a whole (and related statutes)—and the reality of what is going on in all these activities (*e.g.*, cigarettes, cigars, pipes, chew)—offends the "textualist" sensibilities of the dissent.

[1] Harvard Law School, *The Antonin Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes*, YouTube (Nov. 25, 2015), https://youtu.be/dpEtszFT0Tg.

now.' . . . It seems I was wrong." *West Virginia v. EPA*, 597 U.S. 697, 779 (2022) (Kagan, J., dissenting). Like Justice Kagan, the majority seems to be coming full circle on the issue of textualism.

I agree with my colleagues that the legislature probably intended to tax all "other" tobacco products. But the text of section 210.25(12) falls short of that intention. The majority readily concedes that hookah tobacco is not lit on fire, it is not consumed, and it produces vapor, not smoke. We should not be in the business of filling the gap between the intent of the legislature and the text adopted.

The definition of "tobacco products" subject to OTP taxes and surcharges has remained unchanged since 1985. *See* ch. 85-141, § 1, Laws of Fla. Almost forty years ago the legislature defined "tobacco products" to mean

> loose tobacco *suitable for smoking*; snuff; snuff flour; cavendish; plug and twist tobacco; fine cuts and other chewing tobaccos; shorts; refuse scraps; clippings, cuttings, and sweepings of tobacco, and other kinds and forms of tobacco prepared in such manner as to be suitable for chewing; but "tobacco products" does not include cigarettes, as defined by s. 210.01(1), or cigars.

§ 210.25(12), Fla. Stat. (emphasis added).

The defined products range from the specific, like cavendish,[2] to broader categories of products like "loose tobacco suitable for smoking." We have been asked to determine whether hookah tobacco falls under the phrase "loose tobacco suitable for smoking."

Conventional loose smoking tobacco is consumed by directly igniting tobacco leaves to produce an inhalable smoke. It is undisputed that hookah tobacco is a distinct product. Hookah

---

[2] Cavendish is not defined in the statutes. It is a process by which tobacco is heated or pressed to bring out a sweet flavor that is sometimes enhanced with other flavors. *See* Kevin Godbee, *What is Cavendish?*, PipesMagazine.com (December 20, 2013), https://pipesmagazine.com/blog/put-that-in-your-pipe/what-is-cavendish/ (last visited February 17, 2025).

tobacco is manufactured by blending a mixture of tobacco leaves, glycerine, a sugar source like molasses or honey, and flavoring into a finished product. The finished product is sold in various forms and flavors to be consumed through a hookah water pipe. The hookah pipe relies on an indirect heat source to volatilize the glycerine. The resulting vapor, which contains nicotine, passes through the water in the hookah pipe and is inhaled by the user. Hookah tobacco does not reduce to ash like combustible tobacco; it remains in the hookah pipe bowl after use.

In the majority's opinion, the specificity of hookah tobacco and how it is consumed are less important than the "end game" of a quick nicotine hit via inhalation. The majority recognizes there are contemporary dictionary definitions for "smoking" to support both sides of the argument. Recognizing that a dictionary definition will not answer the question, the majority resorts to the common vernacular and a "man on the street" poll to conclude inhaling nicotine-laced vapor gas is the same as smoking. The majority differentiates between a specific definition of smoke that requires burning tobacco and a more general definition that would purportedly include any activity involving heat, "smoke," and nicotine vaporization, regardless of what is burned to get there. The majority favors the general definition over the specific, concluding the specific definition ignores the purpose of tobacco taxation is to regulate addictive behavior relating to nicotine.

I agree with the majority that the legislature likely intended to regulate all "other" tobacco products to protect Floridians from the harmful effects of nicotine. However, we are tasked to interpret the words the legislature enacted to accomplish its goals. While there may be policy reasons to tax all nicotine delivery products, we cannot use the intent of the legislature to effectively amend the adopted text.

Our analysis requires us to interpret tax statutes, which must be construed narrowly. *Brandy's Prods., Inc. v. Dep't of Bus. & Pro. Regul.*, 188 So. 3d 130, 132 (Fla. 1st DCA 2016) ("[I]t is well-settled that tax statutes are to be construed narrowly, not broadly.") (citing *Maas Brothers, Inc. v. Dickinson*, 195 So. 2d 193, 198 (Fla. 1967)). In *Maas Brothers*, the supreme court stated,

It is a fundamental rule of construction that tax laws are to be construed strongly in favor of the taxpayer and against the government, and that all ambiguities or doubts are to be resolved in favor of the taxpayer. This salutary principle is found in the reason that the duty to pay taxes, while necessary to the business of the sovereign, is still a duty of pure statutory creation and taxes may be collected only within the clear definite boundaries recited by statute[.]

195 So. 2d at 198.

Because hookah tobacco does not clearly fall within the definition in section 210.25(12), any ambiguity or doubt, if any actually exists, must be resolved in Appellant taxpayer's favor. I would reverse.

_____

Gerald J. Donnini and Jonathan W. Taylor of Moffa, Sutton, & Donnini P.A., Fort Lauderdale, for Appellant.

Brooke Elizabeth Adams, Department of Business and Professional Regulation, Tallahassee, for Appellee.